**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| THE STATE OF LOUISIANA and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, | CIVIL ACTION NO. _____ |
| Defendants. | |

## INTRODUCTION

1.　　　"'[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action. . . . This interest survives criminal conviction and incarceration.'"[1]

2.　　　A prison system has several basic functions:　booking new prisoners into the system, taking care of them when they are in custody, and releasing them when their sentence is complete.　Louisiana falls short on the third function.　The State incarcerates thousands of people each year after they have satisfied their sentences and are entitled to release under state law.　State officials know that systemic operational deficiencies in the Louisiana Department of Public Safety and Corrections ("LDOC") have caused this overdetention.　Indeed, while serving as Louisiana Attorney General in 2018, Governor Jeff Landry complained in an op-ed that there is "a layer of

---

[1] *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979)).

incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."[2]

3.        Louisiana routinely detains people weeks and months past their release dates. Since at least 2012, more than a quarter of the people due to be released from LDOC's custody each year are instead held past their release dates.  This deprivation of liberty and the State's deliberate indifference to systemic overdetention violates the Fourteenth Amendment to the Constitution of the United States.  The United States files this Complaint pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997-1997j (CRIPA), to vindicate the Constitutional rights of those unlawfully detained and to seek injunctive relief to end the rampant and longstanding overdetention in Louisiana.

## PARTIES

4.        Plaintiff is the UNITED STATES OF AMERICA.

5.        Plaintiff, through the Department of Justice (Department or DOJ), is charged with enforcing CRIPA and brings this action under its enforcement authority, as set forth in 42 U.S.C. § 1997a(a).  CRIPA authorizes the United States to bring a civil action whenever it has reasonable cause to believe that any state or political subdivision of a state is engaged in a pattern or practice that denies institutionalized persons any rights, privileges, or immunities protected by the Constitution or the laws of the United States.  42 U.S.C. § 1997a(a).

---

[2] *McNeal v. LeBlanc*, 90 F.4th 425, 430 (5th Cir. 2024) (quoting John Kennedy and Jeff Landry, *Criminal Justice Reform Actually Hurting Public Safety*, The Advocate, Mar. 8, 2018, https://www.theadvocate.com/baton_rouge/opinion/u-s-sen-john-kennedy-ag-jeff-landry-column-criminal-justice-reform-actually-hurting-public/article_ffcd8746-22df-11e8-a865-ab8c0c15b354.html [https://perma.cc/6FM8-29RV]).

6.      Defendants are the STATE OF LOUISIANA and the LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 because it arises under the laws of the United States, and the United States brings this case as a plaintiff.

8.      The United States is authorized to initiate this action pursuant to 42 U.S.C. § 1997a(a).

9.      The Attorney General has certified that all pre-filing requirements specified in 42 U.S.C. § 1997b have been met.  The Certificate of the Attorney General is appended to this Complaint as Attachment A and is incorporated herein.

10.      LDOC's headquarters are located in the parish of East Baton Rouge, city of Baton Rouge, Louisiana.  Venue in the United States District Court for the Middle District of Louisiana is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

11.      On December 3, 2020, Plaintiff, the United States, acting through the Department of Justice's Civil Rights Division and the three United States Attorney's Offices for the State of Louisiana, notified Louisiana's Governor John Bel Edwards that the Department had opened a CRIPA investigation pursuant to 42 U.S.C. § 1997 *et seq.*, into LDOC's time computation and release practices to determine "whether the DOC is engaging in a pattern or practice of violating the constitutional rights of convicted prisoners by detaining them at DOC and

local correctional facilities past their release dates, including detaining prisoners who are eligible for immediate release."

12.    During the investigation, following detailed interviews with employees knowledgeable about LDOC's data systems and operations, the Department outlined the methodology for analyzing sentencing data that LDOC provided.  LDOC confirmed the accuracy of this methodology in writing, which the Department used to determine the overdetention statistics for individuals in LDOC's custody.

13.    On January 25, 2023, the Department notified Governor Edwards that the Department had concluded its investigation and issued a written CRIPA Findings Report finding reasonable cause to believe that Defendants violate the Fourteenth Amendment by routinely confining people in LDOC's custody past the dates when they are legally entitled to be released, pursuant to a pattern or practice of resistance to the full enjoyment of incarcerated persons' constitutional rights.

14.    As the statute requires, the CRIPA Findings Report detailed the supporting facts giving rise to the alleged constitutional violations, namely that: (a) LDOC denies individuals' due process rights to timely release from incarceration; (b) LDOC fails to implement adequate policies and procedures to prevent systemic overdetentions; and (c) LDOC is deliberately indifferent to the systemic overdetention of people in its custody.

15.    To this date, the overdetention of individuals in Defendants' custody continues, and reasonable efforts at voluntary correction have not succeeded.

### A.    Overdetention in Louisiana

16.    Overdetention, the practice of incarcerating an individual after they have completed their sentence with no lawful detention order, violates a core constitutional right:  the right to individual liberty.

17.    The fundamental duties of a jailer "include not only the duty to protect a prisoner, but also the duty to effect his timely release."[3]

18.    "[I]t is the Court's constitutional duty to intervene when the State endeavors to detain its citizens *without* lawful authority, *beyond* their release dates."[4]

19.    Recognizing these cornerstone principles, federal courts have long upheld the "'clearly established right to timely release from prison' upon completion of [one's] sentence."[5]

20.    It is longstanding precedent in the Fifth Circuit that "[d]etention of a prisoner for over thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process."[6]  Detaining a person just 48 hours after their release date may also be unconstitutional absent justifiable administrative delays.

21.    For over a decade, Defendants have maintained a pattern or practice of holding individuals far past their legal release date in violation of the Due Process Clause of the Fourteenth Amendment.

22.    The data show that in 2012, at least 319 people not eligible for immediate release at sentencing were overdetained more than 30 days between June and September.  A further 167

---

[3] *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968).

[4] *Buchicchio v. LeBlanc*, 656 F.Supp.3d at 661 n.8.

[5] *Id.* at 656 (quoting *Crittindon v. LeBlanc*, 37 F.4th at 188).

[6] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (quoting *Douthit v. Jones,* 619 F.2d 527, 532 (5th Cir. 1980)).

people eligible for immediate release at sentencing were held for an average of 51 days past their release date.

23.    Five years later, in 2017, overdetention persisted with Louisiana's data showing that at least 451 people not eligible for immediate release at sentencing were overdetained more than 30 days between June and September. Two hundred twenty-one people who should have been immediately released at sentencing were held an average of 68 days past their release date.

24.    Four years later, in 2021, 561 individuals not eligible for release at sentencing were overdetained more than 30 days between June and September. An alarming 495 individuals eligible for immediate release upon sentencing were held an average of 55 days before being released.

25.    In 2022, Louisiana's data show that overdetention continued with at least 544 people not eligible for immediate release at sentencing overdetained for more than 30 days between January and April 2022. Another 599 people eligible for immediate release at sentencing were overdetained past the 30-day threshold—representing more than a 20% jump from 2021—and held for an average of 62 days past sentencing.

26.    Data from 2024 confirm that LDOC continues to overdetain people beyond 30 days. Following parameters that LDOC itself selected in order to identify immediate releases, these data sets included every individual in LDOC's custody who, in February 2023, February 2024, and May 2024, was released within seven days of their release date being calculated. In these latest data sets, 82 percent of those who were overdetained were held over for at least 30 days. And 332 people entitled to immediate release were held an average of 29 days past their release date. In May 2024 alone, at least 141 individuals were overdetained, 120 of them for more than a month past their release date.

27.     Of those individuals overdetained less than 30 days—overall a minority of the overdetentions—Defendants' data show that at least half of those individuals remained incarcerated 15 days or more past their legally mandated release dates.

**B.      Defendants' Legal Responsibility for Individuals Sentenced to Their Custody**

28.     Under Louisiana law, a person receiving a felony sentence of confinement enters Defendants' legal custody at the moment the court hands down the sentence, regardless of where the person is physically incarcerated.

29.     This remains true for individuals who, for a variety of reasons (e.g., time spent detained before trial), are already due for immediate release from detention at the time of sentencing.

30.     Defendants continue holding individuals with a felony sentence of confinement in their legal custody—and those individuals remain incarcerated in state or local facilities—for whatever length of time it takes Defendants to process and effect their release.

31.     Defendants currently detain in their legal custody approximately 29,000 people serving Louisiana State prison terms.[7]

32.     Yet, due to capacity limits at state-run correctional facilities, Defendants reimburse local parish jails and private facilities throughout the State to house approximately 15,000 of the people serving state sentences.

33.     Under Louisiana law, Defendants have the authority to establish minimum, mandatory standards for parish jails that house people in LDOC's custody.  Defendants can

---

[7] La. Dep't of Public Safety & Corr., *Demographic Dashboard*, https://doc.louisiana.gov/demographic-dashboard/ (last visited Oct. 21, 2024) [https://perma.cc/UDN7-LS5H ].

establish these minimum standards through the Basic Jail Guidelines, which the Louisiana Sheriffs' Association agrees to follow on behalf of the parish jails that house people serving state sentences. Additionally, Defendants can formalize housing standards by entering contracts with some local facilities known as Cooperative Endeavor Agreements (CEAs).

34.    As explained in detail below, Defendants have failed to use their authority to set mandatory standards around document collection, retention, transmission, and processing timelines that would reduce or eliminate overdetention in Louisiana.

### C.    Defendants' Constitutionally Deficient Policies, Procedures, and Systems Driving Overdetention

35.    Despite being on notice of overdetention for over a decade, Defendants continue to use outdated, unreliable, and inefficient systems and practices that result in errors and unreasonable administrative delays causing widespread overdetention.

36.    These errors and unreasonable administrative delays occur at every step of the release process. Delays occur in: LDOC's (i) obtaining sentencing paperwork from the Clerks of the Court and local Sheriff's Departments where individuals are incarcerated that are necessary to calculate each person's release date; (ii) conducting a manual review of that sentencing paperwork and hand-calculating individual release dates; and (iii) completing release procedures to issue a release certificate for every person due to be released. The errors and unreasonable administrative delays are worsened by (iv) LDOC's failure to adequately train its employees.

8

i.    *Inefficient and non-uniform methods of obtaining necessary sentencing paperwork to timely calculate release dates*

37.    The pattern or practice of routine overdetention in Louisiana begins with Defendants' failure to establish uniform policies and processes for obtaining necessary sentencing paperwork from Clerks of the Court and local Sheriff's Departments for individuals serving state sentences while housed at parish jails, the first step in the release process.  As a result, it may take weeks for LDOC to receive necessary paperwork before they can begin calculating release dates for these individuals.

38.    LDOC's Preclassification Department ("Preclass") is responsible for managing sentencing records, calculating release dates, and completing the administrative process that generates release certificates that allow individuals to be released.

39.    Preclass must have the Bill of Information, Uniform Commitment Order, and additional paperwork from the local jail to determine an individual's release date.  Time computation cannot occur without all required documents; those documents must be both accurate and complete.

40.    The Clerk of Court collects the Bill of Information and Uniform Commitment Order.  The Bill of Information includes charging information and the offense date, while the Uniform Commitment Order contains sentencing information.  For individuals housed in parish jails, the Clerk of Court forwards this information via physical mail, fax, or hand-delivery to the Sheriff's office overseeing the parish jail where the individual is incarcerated.

41.    Defendants have failed to establish a uniform statewide process for the Clerk of Court to transmit these documents.  Over five years ago, LDOC declined the Louisiana Clerks of Court Association's (LCCA) offer to send the documents to LDOC electronically.

9

42.     Once it receives the documents from the Clerk of Court, the Sheriff's office combines the Bill of Information and the Uniform Commitment Order with additional records from the parish jail to create a "preclass" packet. The Sheriff's office delivers the packet to Preclass. Delivery method—including physical mail, email, and hand-delivery—varies between parishes.

43.     Defendants have failed to establish a uniform statewide process for the Sheriff's offices to transmit preclass packets to LDOC's Preclass Department. Defendants have the authority, via the Basic Jail Guidelines and the CEAs, to set forth mandatory standards for the parish jails implementing a timeframe and uniform method for the delivery. The Defendants have failed to set mandatory standards.

44.     Based on data from January to April 2022, it took on average 21 days from the time an individual is sentenced to state custody to Defendants' receipt of preclass packets for individuals who were entitled to *immediate release* at the time of sentencing.

45.     These types of delays largely result from Defendants' failure to implement a uniform statewide process for handling sentencing paperwork between the Clerks of Court, Sheriffs' Offices, and Preclass.

46.     Packets received by Preclass are frequently incorrect or incomplete.

47.     Defendants do not have a reasonably adequate, standardized process that Preclass follows in the event it receives incorrect or incomplete paperwork from a parish. This leads Preclass employees to follow arbitrary, ad hoc processes for responding to an incorrect or incomplete preclass packet.

48.    LDOC personnel stated during the Department's investigation that around 5 to 10 of every 60 preclass packets received from parishes daily are missing documents, leading to additional delays in receipt of complete sentencing packets.

49.    Defendants' failure to assert control over this unregulated document collection process leads to unreasonable administrative errors and delays, resulting in widespread and lengthy overdetention.

50.    In sum, and despite their legal responsibilities for the people in their custody and their ability to exercise control over local parish facilities where individuals are housed, Defendants have failed to implement reasonably adequate policies and practices necessary to ensure that Preclass receives complete and accurate preclass packets in a timely manner.

       ii.    *Manual review of sentencing paperwork and manual calculation of release dates*

51.    In addition to delays in receiving complete and accurate sentencing paperwork from Sheriffs' Offices, further delays are occasioned by Defendants' antiquated, inefficient, and flawed time computation processes.

52.    The time computation process relies on individual review of documents and manual entry of relevant data.

53.    After an initial screening, Defendants scan the preclass packet into Oracle, a separate electronic document database used to store sentencing and incarceration records for individuals sentenced to state custody.

54.    The Oracle records are maintained in non-text searchable formats. To find information necessary for performing individual time computations, Preclass staff undergo a lengthy manual review process whenever they consult Oracle records.

55.    Preclass staff then type the pieces of information they find from reading individual Oracle records into a system called the Criminal and Justice Unified Network (CAJUN).

56.    Defendants have used CAJUN since 1991 to track people in its custody, process time computations, and calculate release dates.

57.    CAJUN does not have the capacity to electronically calculate release dates.

58.    Preclass staff manually calculate release dates based on factors including the date of sentencing, the length of the sentence(s) imposed, whether multiple sentences run concurrently or consecutively, credit for time served, good time credits (including credits earned for certified treatment and other programs, and credits lost due to behavior), and parole revocation calculations.

59.    Preclass staff then type the release date resulting from the time computation into CAJUN.

60.    Since 2018, Defendants have used a "check system" as a secondary review of time computations to verify the accuracy of release date calculations.  As part of the "check system," the initial Preclass analyst and a second analyst manually review a sample of time computations and make check-mark notations on the margins of the calculation sheets to indicate when both analysts independently reach the same result from their manual calculations.

61.    Once the Preclass analysts complete this "check" process, any new time computation results are entered into CAJUN.

62.    Any subsequent recalculations of a release date, including following the "check" process, is entered into CAJUN in the same location as previously entered data, causing any prior time computations to be overwritten and lost.

63.    Defendants' manual time computation processes routinely yield inaccurate release dates.

64.    State legislative audits conducted in 2017 and 2019 found error rates in time computations of 19% and 12% respectively.[8]

65.    Defendants' failure to put in place reasonably adequate time computation policies and practices causes foreseeable errors and avoidable systemic delays, resulting in widespread and lengthy overdetention.

###        iii.        *Defendants' Cumbersome Release Procedures*

66.    Once Defendants complete their time computation processes, they begin release procedures for individuals entitled to release.

67.    First, a Preclass supervisor reviews the time computation and, where the individual is not housed in an LDOC facility, Preclass contacts the local parish facility where that person is detained for information about potential detainers, additional sentences, transfers, and other relevant housing information.

68.    Preclass then determines whether the individual has any remaining open criminal charges, which requires manually checking the individual's State Police Rap Sheet. If the charges on the Rap Sheet do not indicate that the individual's charges have been cleared or resolved, then

---

[8] La. Leg. Auditor, *Mgmt. of Offender Data: Processes for Ensuring Accuracy, Dept. of Corr.* 6–9 (Oct. 25, 2017) ("2017 Legislative Audit"),
https://app.lla.la.gov/PublicReports.nsf/1284612EDBDB25E5862581C40056189F/$FILE/0001674C.pdf
[https://perma.cc/G9S7-DF3E]; La. Leg. Auditor, *Dept. of Pub. Safety and Corr.—Corrections Services, State of La.* 1–2 (Oct. 23, 2019) ("2019 Legislative Audit"),
https://app.lla.state.la.us/PublicReports.nsf/B9BA7E809F593D2C8625849C0050EB3B/$FILE/0001E569.pdf
[https://perma.cc/3PKM-ZKKS].

Preclass must reach out to courts and district attorneys from the parish of conviction to individually check every arrest that does not have a disposition.

69.    This multi-step process prior to effecting release requires Defendants to work with outside agencies to obtain additional information and perform more manual checks.

70.    Once Defendants have completed their release procedures, Preclass issues a release certificate and forwards it as appropriate to the housing facility or Probation and Parole office, at which point the individual should be released. Preclass then updates the CAJUN database to type in the date the release certificate was issued and scans the release documents into Oracle.

71.    LDOC has described these release procedures as "cumbersome and time consuming."

72.    These cumbersome release procedures contribute to unreasonable administrative errors and delays.

73.    Furthermore, to prevent lengthy delays in the release procedures for individuals entitled to immediate release, Defendants maintain that intake personnel are told to prioritize the time computations and release processing for those individuals. However, LDOC does not have any formal policy or practice in place on how to identify and prioritize these people. Intake personnel are left to their discretion to visually scan each person's preclass packet and predict, *prior to making any time computation*, whether the person is likely due for immediate release and should be prioritized.

74.    From January to August 2022, it took LDOC an average of 24 days *after* receiving a completed preclass package to release individuals entitled to immediate release.

14

iv.    *Defendants' Failure to Adequately Train Employees*

75.        Defendants' inadequate training for employees involved in the intake and time computation processes further drive errors and delays causing overdetention.

76.        All Preclass analysts receive the same initial orientation training, which was originally created in 2013.

77.        This orientation training covers only the basics of Preclass functions. The training does not address the more complex aspects of release date calculations that are more prone to error from manual calculations, such as the importance of multiple factors on sentence calculation.

78.        This orientation training does not cover all Preclass functions.  For instance, the training does not include instructions on the "check system" LDOC maintains it operates as a monthly auditing system.

79.        LDOC insufficiently updates the training materials for its initial orientation modules.

80.        A significant portion of Defendants' on-the-job training for the time computation group takes place on an ad hoc basis—only after an error has occurred, or concerns about an individual case have been raised.

81.        LDOC does not conduct regular or ongoing training in response to its monthly "check system" audit results.

82.        On November 17, 2022, LDOC reportedly initiated a pilot program to train other, non-Preclass employees in intake and time computation, which LDOC stated will allow it to deploy employees more effectively to calculate time sentences.

83.     According to LDOC's most recent data, even after reportedly initiating the pilot training program, it still takes at least 9 days on average for Preclass to process an individual's preclass packet and complete their time computations, even when those individuals were entitled to immediate release upon sentencing.

84.     Defendants' lack of adequate training is a direct cause of the delays and errors in the time computation process that lead to systemic overdetention in Louisiana.

### D.    Defendants' Deliberate Indifference

85.     Defendants are deliberately indifferent to the risk of systemic overdetention through their failure to implement reasonably adequate policies and procedures or adequately train their employees.  They have (i) been on notice of overdetention in Louisiana for over a decade; and (ii) have nonetheless failed to remedy the systemic overdetention that continues to plague individuals in Defendants' custody.

### i.    *Defendants' Long-Standing Knowledge of Overdetention*

86.     Defendants have had explicit knowledge of the ongoing pattern of overdetention since at least 2012 when state auditors, using the Lean Six Sigma method, reviewed the Preclass time computation process.  This Lean Six Sigma audit found that it took, on average, 110 days from the date of an individual's conviction for LDOC staff to process and complete a person's time computation.  The delays led to a backlog of over 1,400 cases awaiting time computation, with 83 percent of those cases resulting in overdetention.

87.     Adding on to deficiencies identified by the Lean Six Sigma audit, a 2017 Louisiana legislative audit report found that LDOC's procedures for monitoring data entry,

16

especially for people housed in local facilities, were insufficient to consistently identify data errors.[9] This report also found that LDOC's process for time computation lacked standardized guidance resulting in inconsistent methods and systemic data errors.[10]

88.    Another legislative audit report in 2019 evaluated LDOC's operations and system of internal quality control.[11]  That report found numerous errors in sampled time computations and insufficient supervisory review of release date calculations.[12]

89.    Further September 2023 and August 2024 legislative audit reports acknowledged that Defendants have a practice of providing a second-level review of initial time computations.  But the reports found that this "check system," as described above, is not clearly outlined in a written policy and does not target subsequent changes to time computations resulting from the application of credits and forfeitures.[13]  Similarly, Defendants' practice of performing monthly reviews only applies to initial time computations and does not review time computations for those already in the State's system, which auditors found to increase the risk that errors will not be timely identified and corrected.[14]  These most recent legislative audits demonstrate that

---

[9] 2017 Legislative Audit.

[10] *Id.*

[11] 2019 Legislative Audit.

[12] *Id.*

[13] La. Leg. Auditor, *Dep't of Public Safety & Corr. – Corr. Servs.*, Audit Control # 80220064, Financial Audit Services 4 (Sept. 6, 2023) ("2023 Legislative Audit"), https://app.lla.state.la.us/publicreports.nsf/0/38b749b269d7141c86258a220052b512/$file/000029db.pdf?openeleme nt&.7773098 [https://perma.cc/XKU9-EZHD]; La. Leg. Auditor, *Dep't of Public Safety & Corr. – Corr. Servs.*, Audit Control # 80240014, Financial Audit Services 4 (Aug. 28, 2024) ("2024 Legislative Audit"), https://app2.lla.state.la.us/publicreports.nsf/0/ed0286274aa453fd86258b8500587c45/$file/00005c88.pdf?openeleme nt&.7773098 [https://perma.cc/R2CF-HZKD].

[14] 2023 Legislative Audit; 2024 Legislative Audit.

Defendants have failed to adequately address its deficient system of internal quality control review of time computations.

90.    The legislative audit reports' conclusions regarding Defendants' inadequate system of internal quality control are consistent with findings from the Department's 2023 CRIPA report, which provided Defendants with notice of the specific systemic deficiencies that are contributing to persistent overdetention in Louisiana.

91.    Despite Defendants' notice going back at least twelve years, endemic overdetention continues in Louisiana as a result of Defendants' failure to take reasonable remedial measures.  The most recent available data provided by LDOC show that at least 141 individuals were overdetained in May 2024 alone, 120 of whom were overdetained for more than a month. Almost 80%, or 112 of the 141 overdetained individuals, were eligible for immediate release at the time of sentencing.


*ii.  Defendants' Failure to Remedy Known Overdetention*

92.    Defendants' deliberate indifference is further demonstrated by their failure to take adequate steps to remedy the systemic deficiencies causing overdetention, despite being on notice of recommendations to mitigate the risk of overdetention since 2012.

93.    The 2012 Lean Six Sigma audit and the subsequent 2017 and 2019 Louisiana legislative audits contained several recommendations to address LDOC's overdetention problem. These recommendations included instituting required standardized procedures to ensure that Sheriffs' offices timely submit preclass packets to LDOC, improving LDOC's internal quality control processes for its preclass operations, and standardizing preclass and time computation procedures.

94.      Similarly, the Department's 2023 CRIPA findings report identified minimum remedial measures to address Defendants' systemic deficiencies causing overdetention.

95.      Defendants have only taken marginal steps since the 2012 Lean Six Sigma audit, 2017 and 2019 legislative audits, and the Department's 2023 CRIPA Findings Report to correct the Due Process violations around overdetention.  Those steps are inadequate, and systemic overdetention persists.

96.      The Defendants began developing the Corrections Information Program and Records System (CIPRS), an offender management system, in 2018.  CIPRS is intended to replace all CAJUN programs, including those used in LDOC's sentence calculation and release processes.

97.      Six years later, CIPRS is still not fully implemented.

98.      Defendants continue to rely on CAJUN and Oracle for Preclass functions and sentencing calculations, despite their known inadequacies.

99.      Despite well-known difficulties collecting the necessary documents for the preclass packet, Defendants also did not add an online portal to allow electronic document submission to CIPRS until after the release of the Department's 2023 Findings Report.

100.      Moreover, the online portal is only a limited scope pilot program.

101.      Nor will this online portal be the lone savior preventing overdetention in Louisiana.  Recent data from LDOC demonstrates that, even for the handful of parishes then participating in the CIPRS online portal pilot, there remained a significant delay between sentencing and Defendants' receipt of the preclass packet.  In May 2024, it took an average of 33 days, across all parishes, for LDOC to receive this paperwork.  The known parish participants in the online portal pilot averaged two weeks longer—or 48 days total—between sentencing and the time Preclass received the required paperwork.

102.    In addition to Defendants' failure to implement adequate technological upgrades, Defendants' failure to establish a mandatory system of submission for preclass documents from parish jails continues to cause systemic errors and delays resulting in the overdetention of individuals past their legal sentence.

103.    In November 2023, following the release of the CRIPA Findings Report in January 2023, Defendants issued a revised set of Basic Jail Guidelines that, for the first time, includes a timeline for Sheriffs to submit preclass packets. The timeline gives Sheriffs five days to submit preclass packets.

104.    This five-day timeline for Sheriffs to submit preclass packets is "Non-Mandatory," meaning it is not a required part of Defendants' annual Basic Jail Guidelines compliance reviews.

105.    The November 2023 Basic Jail Guidelines do not include a mechanism to sanction Sheriffs for failure to comply with the new timeline.

106.    The most recent data since the November 2023 Basic Jail Guidelines revision do not support the idea that these non-mandatory guidelines even encourage adherence to the five-day timeline. For instance, in February 2023, it took an average of 25 days for LDOC to receive preclass packets; the length of time increased to 54 days in February 2024, immediately after Basic Jail Guidelines were revised. In May 2024, the average length of time remained longer than 30 days.

107.    Parish jails continue to be reimbursed per diem for the housing of individuals, even if those are individuals are overdetained because the parish has failed to comply with the Basic Jail Guidelines' timeline for submitting preclass packets to LDOC.

108.     Since 2012, when they were put on notice of widespread cases of overdetention and the contributing systemic causes, Defendants have remained deliberately indifferent to the pattern or practice of overdetention.

109.     The marginal steps that Defendants have taken since the Department's CRIPA Findings Report, which could have been implemented in the decade prior to the issuance of the Department's CRIPA Findings Report, inadequately address the systemic deficiencies that cause overdetentions and do not mitigate their continued deliberate indifference.

110.     Defendants' marginal efforts have not adequately corrected the systemic deficiencies in LDOC's policies and practices as identified in the CRIPA Findings Report, the 2012 Lean Six Sigma audit, and the state legislative audits, despite all three sources providing actionable recommendations to correct those deficiencies.

111.     Instead of addressing overdetention, Defendants continue to fail to track overdetention-related data, including the frequency of overdetentions, the frequency at which courts and parish jails fail to submit timely and complete preclass packets, and the amount of reimbursement payments sent to parish jails for housing individuals during periods when they were overdetained.

112.     Defendants continue to overdetain individuals for weeks or months beyond those persons' lawful release dates.

113.     Defendants' unconstitutional practice of overdetention results in thousands of people being overdetained annually, costing Louisiana over $2.5 million a year.

## COUNT I

## VIOLATION OF FOURTEENTH AMENDMENT

114.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

115.    Under Louisiana law, when a person is convicted and receives a state felony sentence of confinement in Louisiana, they enter Defendants' legal custody at the moment the court hands down the sentence.

116.    These individuals therefore remain incarcerated until Defendants calculate their sentence and allow their release.

117.    Defendants have a constitutional obligation to ensure the timely release of individuals in their legal custody.

118.    Defendants have engaged in a pattern or practice of violating the Fourteenth Amendment right to timely release of individuals in their custody by holding them past their release dates.

119.    Defendants' failure to adopt reasonably adequate policies to ensure the timely release of incarcerated individuals and failure to adequately train their employees are the cause of these constitutional violations.

120.    Defendants have overdetained thousands of individuals in their custody over the past decade, establishing a pattern of similar constitutional violations.

121.    Additionally, several independent reports and audits have put Defendants on notice of systemic overdetention and its causes for over a decade.

122.    Defendants have been on notice, as well, that their responses to this systematic overdetention have been woefully inadequate.  Therefore, Defendants have shown deliberate indifference by disregarding a known or obvious consequence of their actions or inactions.

123.     Unless this Court orders Defendants to comply with their constitutional obligations under the Fourteenth Amendment, Defendants will continue to engage in the acts and omissions, as described in this Complaint, that deprive individuals incarcerated in the custody of the State of Louisiana of privileges or immunities secured or protected by the Fourteenth Amendment to the Constitution of the United States.

**PRAYER FOR RELIEF**

124.     The Attorney General is authorized under 42 U.S.C. § 1997a to seek appropriate equitable relief.

125.     WHEREFORE, the United States prays that this Court enter an order:

    (a)     declaring that the acts, omissions, and practices of the Defendants set forth in this Complaint constitute a pattern or practice of conduct that deprives individuals held in the custody of the State of Louisiana of rights, privileges, or immunities secured or protected by the Constitution of the United States and that those acts, omissions, and practices violate the Fourteenth Amendment to the Constitution of the United States;

    (b)     permanently enjoining Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participation with them from continuing the unlawful acts, omissions, and practices set forth in this Complaint;

    (c)     requiring Defendants, their officers, agents, employees, subordinates, successors in office to take such actions as will ensure Due Process rights to timely release are afforded to all individuals in LDOC's custody; and

(d)    granting such other and further equitable relief as it may deem just and

proper.

DATED this ___19 th___ day of ___December___, 202_4___

Washington, District of Columbia

Respectfully Submitted,

FOR THE UNITED STATES:

_____

MERRICK B. GARLAND
Attorney General
United States of America

24

*/s/ Ronald C. Gathe, Jr.*
RONALD C. GATHE, JR.
United States Attorney
Middle District of Louisiana

*/s/ Katherine K. Green*
KATHERINE K. GREEN, LBN 29886
Assistant United States Attorney
United States Attorney's Office
Middle District of Louisiana
777 Florida Street
Baton Rouge, Louisiana 70801
Office: (225) 389-0443
Fax: (225) 389-0685
E-mail: katherine.green@usdoj.gov

*/s/ Duane A. Evans*
DUANE A. EVANS
United States Attorney
Eastern District of Louisiana

*/s/ Sandra Ema Gutierrez*
SANDRA EMA GUTIERREZ
Assistant United States Attorney
United States Attorney's Office
Eastern District of Louisiana
650 Poydras Street
New Orleans, Louisiana 70130

*/s/ Brandon Bonaparte Brown*
BRANDON BONAPARTE BROWN
United States Attorney
Western District of Louisiana

*/s/ Shannon T. Smitherman*
SHANNON T. SMITHERMAN
Chief, Civil Division
Assistant United States Attorney
United States Attorney's Office
Western District of Louisiana
300 Fannin Street
Shreveport, Louisiana 71101

*/s/ Kristen Clarke*
KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Regan Rush*
REGAN RUSH
Chief
Special Litigation Section

*/s/ Maura M. Klugman*
MAURA M. KLUGMAN
Deputy Chief
MARLYSHA MYRTHIL
Senior Trial Attorney
CURTIS HARRIS
MATTHEW UNDERWOOD
ASHLEY LIGHT
Trial Attorneys
950 Pennsylvania Avenue, NW (4CON)
Washington, D.C. 20530

CERTIFICATE OF THE ATTORNEY GENERAL

With regard to the foregoing Complaint in *United States v. Louisiana, et al.*, I, Merrick B. Garland, Attorney General of the United States, certify that the United States Department of Justice has complied with all subsections of 42 U.S.C. §§ 1997b(a)(l) and (a)(2).  I further certify, pursuant to 42 U.S.C. § 1997b(a)(3), my belief that this action by the United States is of general public importance and will materially further the vindication of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

In addition, I certify that I have the "reasonable cause to believe" set forth in 42 U.S.C. § 1997a to initiate this action and that all prerequisites to the initiation of this suit under 42 U.S.C. §§ 1997a and 1997b have been met.

Pursuant to 42 U.S.C. § 1997a(c), I have personally signed the foregoing Complaint. Pursuant to 42 U.S.C. § 1997b(b), I am personally signing this Certificate.

Signed this _19th_ day of _December_____, 202_4_ , at Washington, D.C.


_____
MERRICK B. GARLAND
Attorney General
United States of America

26