# Exhibit A

# INVESTIGATION OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS



United States Department of Justice
Civil Rights Division

January 25, 2023

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................... 1

II.  SUMMARY ................................................................................................................ 1

III.  INVESTIGATION ..................................................................................................... 3

IV.  BACKGROUND ........................................................................................................ 4

    A.    Overview of Individuals in LDOC Custody.......................................................... 4

    B.    LDOC's Preclassification Department and the Sentencing Process ........................... 4

    C.    Time Computation and Release Procedures.................................................................. 6

V.   CONDITIONS IDENTIFIED ................................................................................... 6

    A.    Individuals in LDOC Custody are Being Overdetained Past Their Release Dates in
         Violation of the Fourteenth Amendment................................................................... 7

         1.   Overdetentions of more than 30 days ........................................................... 7

         2.   Overdetentions of less than 30 days.............................................................. 8

    B.    LDOC is Responsible for the Due Process Violations Arising from the Systemic
         Overdetention of Individuals in its Custody............................................................. 8

         1.   LDOC is legally responsible for all individuals sentenced to state custody...... 9

         2.   Deficiencies in LDOC's policies and practices are the cause of systemic
             overdetentions. .......................................................................................... 9

             a.   Failure to adopt policies related to the delivery of sentencing paperwork for
                 individuals housed in parish jails ..................................................... 10

             b.   Failure to adopt adequate time computation processes.................................... 12

             c.   Failure to Train LDOC Staff................................................................. 15

         3.   LDOC is acting with deliberate indifference because it has known for a decade
             that its policies unconstitutionally cause the overdetention of people in its
             custody. .................................................................................................. 16

         4.   LDOC's inadequate efforts at reform do not mitigate the finding of deliberate
             indifference. ............................................................................................. 18

VI.  MINIMAL REMEDIAL MEASURES...................................................................... 20

VII.  CONCLUSION............................................................................................................ 25

## I.    INTRODUCTION

The United States Department of Justice (Department) conducted an investigation of the Louisiana Department of Public Safety and Corrections (LDOC) under the Civil Rights of Institutionalized Persons Act (CRIPA).[1]  The investigation determined that LDOC incarcerates thousands of individuals each year beyond their legal release dates in violation of the Fourteenth Amendment of the United States Constitution.  These violations are pursuant to a pattern or practice of infringements on the constitutional rights of incarcerated persons.

While people convicted of a crime and sentenced to prison must serve their time, LDOC routinely confines people far past the dates when they are legally entitled to be released from custody.  Since at least 2012, more than a quarter of the people set for release from LDOC's custody each year are instead held past their release date, in violation of the due process protections of the Constitution.  These violations are severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in LDOC's policies and practices.  LDOC has persisted with these unconstitutional practices despite at least a decade of notice and clear recommendations for fixing the problem.  LDOC must act to end the overdetention of people in its custody.

## II.    SUMMARY

The Department provides notice of the following practices that violate the constitutional rights of individuals incarcerated by LDOC:

- **LDOC denies individuals' due process rights to timely release from incarceration.** LDOC violates the constitutional rights of people in its custody by detaining them for weeks and often months past their release dates.  According to the most recent available data, of the 4,135 people released from LDOC's custody between January and April 2022, 1,108 (or 26.8 percent) were held past their release dates.  The median number of days an overdetained individual was held past their release date was 29;[2] 31 percent were held over for at least 60 days; and 24 percent were held over for at least 90 days.  In just this four-month period, LDOC had to pay parish jails an estimated $850,000, at a minimum, in fees for the days those individuals were incarcerated beyond their lawful sentences.  At that rate, this unconstitutional practice costs Louisiana over $2.5 million a year.

---

[1] 42 U.S.C. § 1997 *et seq.*

[2] Our findings use the median, rather than the average, number of days by which people were overdetained by LDOC.  This is because the average number of days by which people were overdetained is skewed due to outliers.

- **LDOC's failure to implement adequate policies and procedures causes systemic overdetentions.**  LDOC has failed to implement policies and procedures to ensure the timely release of individuals in its custody.  LDOC does not have a uniform system for receiving necessary sentencing documents from the Clerks of Court and Sheriff's offices.  Nor does it establish a standard timeline for the delivery of those documents.  LDOC maintains a time-consuming process for calculating release dates, which includes both manual calculations and automated processes using an antiquated data management system.  And it lacks a standardized training or accountability process to ensure its staff have the ability to make sentencing computations accurately.  These systemic deficiencies predictably result in delays and errors.  Furthermore, LDOC effectively prevents itself from addressing these problems in an informed manner by failing to track overdetention-related data.  LDOC's failure to remedy these deficiencies is the direct cause of its pervasive failure to release individuals from its custody on time.

- **LDOC is deliberately indifferent to the systemic overdetention of people in its custody.**  For more than ten years, LDOC has been on notice of its overdetention problem and has failed to take adequate measures to ensure timely releases of incarcerated individuals from its custody.  A 2012 Six Sigma report as well as Legislative Audits conducted in 2017 and 2019 revealed severe, systemic delays in the processing of the necessary records from courts and local facilities, inefficient data management, poorly defined procedures, and a lack of training and oversight that have all contributed to a consistent pattern of overdetention.  In addition, LDOC and its officials have faced numerous private lawsuits alerting them to on-going deficiencies in their processes.  Still, LDOC has never implemented the reform that constitutional violations of this magnitude requires.  The reform it has pursued has been too narrow to correct the system-wide causes of overdetention, and some undertakings have failed entirely, as in LDOC's effort to implement a new Offender Management System in 2015.

As a result of the systemic deficiencies identified in our investigation, thousands of individuals annually suffer the significant harm of having their freedom unconstitutionally denied by their overdetention in LDOC's custody.  The COVID-19 pandemic drastically increased the harms associated with overdetention, as the correctional environment carries an elevated risk of contracting COVID-19 and because of the general inability to maintain social distancing in such settings. [3]

Overdetention likewise carries numerous collateral harms to both incarcerated individuals and their families, including missed important family milestones, lost opportunities to say farewell to dying loved ones, lost or missed job opportunities, and diminished opportunities to fully re-integrate into society.

---

[3] Alexander C. Tsai, MD, et al., *Association Between Prison Crowding and COVID-19 Incidence Rates in Massachusetts Prisons, April 2020-January 2021*, JAMA Internal Medicine (Aug. 9, 2021) (finding that there was a six times higher risk of contracting COVID-19 in the Massachusetts prisons as compared to the risk to the general public).

Consistent with CRIPA's statutory requirements, this Findings Report and accompanying cover letter provide notice of the conditions that violate the constitutional rights of individuals detained in LDOC's custody, the facts supporting those conclusions, and the minimum remedial measures necessary to address the identified deficiencies.

## III.     INVESTIGATION

In December 2020, the Special Litigation Section of the Department's Civil Rights Division and the three United States Attorney's Offices for the State of Louisiana opened a CRIPA investigation into LDOC's time computation and release practices.[4]  Our investigation focused on whether LDOC detains people in its custody beyond their release dates.  This investigation considered all relevant information, including efforts the State and LDOC have taken to ensure compliance with the Constitution.  Additionally, we reached out to current and formerly incarcerated persons, their families, and community advocates to better understand their perspectives of the impact of overdetention on incarcerated individuals.

Three expert consultants aided our investigation and provided specialized expertise in areas related to sentence computation practices, data and management analyses, technology systems, and statutory sentencing structures.  Our consultants were engaged based on their significant collective experience helping jurisdictions enhance and extend their operational capabilities in correctional facilities, their prior leadership roles in state correctional agencies, and their expertise performing complex data management assessments for jurisdictions, including municipal agencies in Louisiana.  Collectively, these consultants either directly interviewed or participated in interviews conducted by Department attorneys of 24 LDOC staff and administrators; reviewed thousands of pages of documents, including internal and external audits of LDOC's sentencing computation practices; analyzed current and historical data retrieved from LDOC's system for tracking all incarcerated individuals in its custody; and reviewed quality assurance methods.  They also interviewed third parties, including leadership and members of the Louisiana Sheriffs' Association and Louisiana Clerks of Court Association, to better understand the full extent of the sentence computation process, the responsibilities those entities have in the process, and their coordination efforts with LDOC.  Our consultants relied on all this information to inform this investigation and provide their expert opinions.

 The State and LDOC cooperated fully in our investigation, despite the challenges posed by the pandemic, and provided additional interviews and documents in response to our follow-up requests.

---

[4] https://www.justice.gov/opa/pr/justice-department-announces-civil-investigation-louisianas-prisoner-release-practices.

## IV.    BACKGROUND

### A.    Overview of Individuals in LDOC Custody

When a person is convicted and receives a state felony sentence of "confinement at hard labor" in Louisiana, they enter LDOC's custody at the moment the court hands down the sentence.[5]  LDOC currently detains in its legal custody approximately 26,000 people serving Louisiana state prison terms.[6]  Due to capacity limits at state-run correctional facilities, LDOC relies on local parish jails and private facilities throughout the state to house people serving state sentences.[7]  Regardless of where an incarcerated individual is housed, however, they remain in LDOC's legal custody once they are sentenced.[8]  LDOC reimburses local and private facilities for the costs incurred housing those in LDOC's legal custody on a daily, or per diem, basis.[9]  Approximately 13,000 people serving state sentences in LDOC's custody are housed in 104 local parish jails, at a cost of approximately $350,000 per day.

Under Louisiana law, LDOC has the authority to establish minimum standards that parish jails must follow in order to house people in LDOC's custody.[10]  LDOC typically establishes these standards through agreements known as Basic Jail Guidelines, which the Louisiana Sheriffs' Association (LSA) agrees to on behalf of the parish jails that house people with state sentences.  Alternatively, in some cases LDOC enters into contracts with local facilities known as Cooperative Endeavor Agreements (CEAs) to formalize housing standards.

### B.    LDOC's Preclassification Department and the Sentencing Process

LDOC's Preclassification Department (known as "Preclass") is responsible for collecting, maintaining, and managing sentencing information and related records for individuals in state custody.  Preclass is also responsible for calculating release dates—referred to as time

---

[5] *Crittindon v. LeBlanc*, 37 F.4th 177, 184 (5th Cir. 2022); La Rev. Stat. §§ 14:2, 15.824.

[6] The total number of individuals in state custody fluctuates on a daily basis as individuals are sentenced or released. The numbers available on LDOC's website are not consistent.  The "Demographic Dashboard" states that there are approximately 26,000 individuals in state custody, with approximately 13,000 held in parish jails (Demographic Dashboard - Louisiana Department of Public Safety & Corrections).  The FAQ section of the website states that there are "more than 36,000 serving time for state felonies," and "[c]apacity at state facilities is just under 19,000." (Frequently Asked Questions - Louisiana Department of Public Safety & Corrections).

[7] https://doc.louisiana.gov/public-programs-resources/frequently-asked-questions/ ("Louisiana simply doesn't have the capacity to house all of people serving time for state felonies in state correctional facilities. Capacity at state facilities is just under 19,000. Therefore, the state relies upon parish and private facilities throughout Louisiana to house and care for people serving time for state felonies. The state reimburses these entities for housing people serving time for state felonies.").

[8] *Crittindon*, 37 F.4th at 184, 191.

[9] *Id.*

[10] La. C. Cr. P. Art 892; La. Rev. Stat. §15:566.

computations—for individuals in state custody and for the timely processing of their release from incarceration. Preclass is located at three regional facilities around the state, each of which is responsible for a distinct group of parishes.[11] In order for Preclass to carry out its responsibilities once an individual is sentenced to state custody, even if that individual is entitled to immediate release at the time of sentencing, Preclass collects a set of records from the Clerk of Court and the parish jail where the individual is housed.[12]

When an individual is sentenced to State custody, the Clerk of Court completes the Bill of Information, which includes charge information and the offense date, and attaches it to a Uniform Commitment Order, which contains the sentencing information and requires the signature of the presiding judge. The clerk then forwards these documents to the Sheriff in the parish where the convicted individual is housed. There is no uniform state-wide process for transmitting these documents, despite the fact that over five years ago LDOC declined the Louisiana Clerks of Court Association's (LCCA) offer to send the documents to LDOC electronically because LDOC claimed it did not have the capability to receive the documents electronically. Typically, they are mailed or hand-delivered to the Sheriff's office.

Once the local parish Sheriff's office receives the sentencing paperwork from the Clerk of Court, it collects those documents with additional records into a "preclass packet," which it then sends to Preclass for time computation.[13] There is no uniform procedure governing the delivery of documents from the Sheriff's office to Preclass. In some jurisdictions, the Sheriff's office physically drives the documents to the regional Preclass office; in others, the Sheriff sends documents by mail or fax. In recent years, LDOC began giving Sheriffs the option of emailing documents, although few jurisdictions appear to have adopted that method.

Preclass packets are critical because Preclass cannot calculate an individual's sentence without the preclass packet. Preclass even requires a sentence calculation before releasing someone entitled to immediate release at the time of sentencing. For individuals who should have been released at the time of their sentencing, our investigation found that from January through April of 2022, it took an average of 21 days for LDOC to receive preclass packets from the courts and Sheriff's offices, and when the preclass packets were finally received, anywhere from 8 to 16 percent were still deficient in some manner due to missing or incorrect documents, adding further delay while the individuals remained confined.

---

[11] LDOC Headquarters' Regional Preclass Department is responsible for the southern parishes and all women statewide who are sentenced to state custody. Raymond Laborde Correctional Center's Regional Preclass Department is responsible for the Orleans, Jefferson, and St. Tammany parishes. David Wade Correctional Center's Regional Preclass Department is responsible for the northern parishes.

[12] With a few exceptions, all pretrial detainees are housed in parish facilities, and the small number of individuals who are housed in state facilities pretrial are transferred back to a parish facility for sentencing. Therefore, Preclass must collect records from the parish facility to complete time computations even if the individual will ultimately be transferred to a state facility after time computation is complete.

[13] In addition to the Uniform Commitment Order and Bill of Information, the preclass packet includes the individual's Basic Information Interview Sheet, Jail Credit Form, photograph, and fingerprint card.

### C.    Time Computation and Release Procedures

There is further delay even after Preclass receives a corrected preclass packet and can begin the time computation process.  During the same January to April 2022 period, it took an average of an additional 24 days *after* their preclass packets were delivered to LDOC for people designated as immediate releases to actually be released.

Preclass uses a system called the Criminal and Justice Unified Network (CAJUN) to process time computations and calculate release dates.  Used since 1991, CAJUN is LDOC's primary system for tracking people in its custody.  LDOC also uses a separate electronic document database called Oracle to maintain incarceration records after an individual has been sentenced to state custody.

While the specifics of the time computation process vary based on the circumstances of each incarcerated individual, it generally involves manually inputting a combination of sentencing information into CAJUN, determining the applicable statute related to good time credits, and calculating the individual's parole eligibility.  The Preclass employee then uses CAJUN to generate a release date based on this information.

Once time computation is complete, release procedures begin for individuals entitled to immediate release.  LDOC has described this process as "cumbersome and time consuming."  A supervisor reviews the time computation and, where the individual is not housed in an LDOC facility, Preclass contacts the local facility for potential detainers, additional sentences, transfers, and other relevant housing information.  Preclass then reviews the individual's criminal history, and if any charges remain open—i.e., if the records do not show that all charges have been cleared—Preclass calls the courts and district attorneys to confirm the resolution of each arrest that does not have a disposition.  Preclass also confirms whether the incarcerated individual's DNA is on file with the State Police and checks any victim notification requirements.

Once these procedures are complete, Preclass issues a release certificate, and forwards it as appropriate to the housing facility or Probation and Parole office, at which point the individual should be released.  Preclass then updates the CAJUN database and scans release documents into Oracle.

## V.    CONDITIONS IDENTIFIED

CRIPA allows the Department to investigate violations of the constitutional rights of persons in correctional facilities when such violations are "pursuant to a pattern or practice of resistance to the full enjoyment of such rights."[14]  The Due Process Clause of the Fourteenth Amendment mandates that no state shall "deprive any person of life, liberty, or property, without due process of law."[15]  Given the "'importance and fundamental nature' of the individual's right

---

[14] 42 U.S.C. §§ 1997(1)(B)(ii), 1997a(a).

[15] U.S. CONST. AMEND. XIV, §1.

to liberty," the Supreme Court has recognized that incarceration "for any purpose constitutes a significant deprivation of liberty that requires due process protection.'"[16]  These due process protections extend to the right to timely release from incarceration.[17]

A. **Individuals in LDOC Custody are Being Overdetained Past Their Release Dates in Violation of the Fourteenth Amendment.**

The fundamental duties of a jailer "include not only the duty to protect a prisoner, but also the duty to effect his timely release."[18]  The Fifth Circuit has held that an overdetention of 30 days or more "constitutes a deprivation of due process,"[19] and that "it is without question" that holding an individual for a month beyond their release date "constitutes a denial of due process."[20]  While courts in the Fifth Circuit (and elsewhere) have not adopted a bright line rule regarding whether overdetention of less than 30 days would amount to a constitutional violation, other Circuits have held that even delays of less than 48 hours can be unconstitutional depending on the circumstances.[21]

1. *Overdetentions of more than 30 days*

LDOC routinely detains people more than 30 days past their release date.  The most recent available data set shows that 544 people were overdetained more than 30 days between January and April 2022.  These figures are in line with data from the previous year, which show that 561 individuals were held for more than 30 days past their release date between June and September 2021.  Under clearly established Fifth Circuit law, each of these overdetentions is presumptively a due process violation.[22]

---

[16] *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (internal citations omitted).

[17] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011).

[18] *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968); *Crittindon*, 137 F.4th at 189.

[19] *Porter*, 659 F.3d at 445; *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

[20] *Crittindon v. LeBlanc*, 37 4th at 188.

[21] *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004) ("[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."); *Berry v. Baca*, 379 F.3d 764, 773 (9th Cir. 2004) (finding the "question of reasonableness [of a 29-hour overdetention] is properly conceived of as a jury determination"); *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) ("It is for a jury to determine whether the 11 hours it took the sheriff to discharge Lewis was reasonable.").  A proposed class action settlement resolving overdetention claims recently filed in the Northern District of California awarded payments to individuals held as little as 12 hours past their valid release dates.  *Camarlinghi v. Santa Clara Cnty.*, No. 21-cv-03020-EJD (LB), ECF No. 76 (N.D. Cal. Aug. 12, 2022).  In addition, under Louisiana law, a person may not be detained after arrest for more than 48 hours without a probable cause determination.  La. Code Crim. Pro. 230.2.

[22] *Porter*, 659 F.3d at 445; *Douthit*, 619 F.2d at 532.

### 2.    *Overdetentions of less than 30 days*

LDOC also routinely detains people less than 30 days past their release date.  While these instances are not presumptive constitutional violations under Fifth Circuit precedent, they are still likely to be found unconstitutional here.  In order to determine whether overdetentions under 30 days amount to constitutional violations, courts most commonly look at (1) the duration of the overdetention and (2) whether the overdetention was caused by reasonable administrative procedures.[23]

First, the January–April 2022 data set shows that the median length of overdetention for people in LDOC custody is 29 days.  Of the individuals overdetained for less than 30 days, 50 percent were held for at least 15 days past their release dates.  Therefore, even those individuals held less than 30 days generally still spent weeks incarcerated past their release date.  This factor weighs in favor of finding due process violations here.

 Second, LDOC cannot claim that delays of days or weeks are the result of necessary administrative procedures.  A jurisdiction that has held an individual past their release date may not rely on a "general assertion that certain steps must be completed prior to release."[24]  Instead, it must explain "why those steps are necessary or why they take a particular period of time to complete."[25]  No court has ever condoned administrative delays lasting close to the amount of time LDOC routinely takes to release prisoners.

As detailed below, the procedures LDOC currently has in place to obtain accurate sentencing information and to perform time computations before releasing an individual from custody involve unreasonable and unnecessary delays.  Consequently, even when an individual in LDOC custody is overdetained by fewer than 30 days, it is likely a due process violation.

### B.    LDOC is Responsible for the Due Process Violations Arising from the Systemic Overdetention of Individuals in its Custody.

LDOC's pattern and practice of depriving those in its custody of their Fourteenth Amendment right to timely release is the direct result of its numerous failures to adopt functional policies and procedures and adequately train its employees despite knowing about these systemic deficiencies for at least ten years.

---

[23] *Berry*, 379 F.3d at 771; *Lewis*, 853 F.2d at 1369–70; *Traweek v. Gusman*, 414 F. Supp. 3d 847, 868 (E.D. La. 2019) ("That an inmate has a due process right to 'timely' release from custody after a judicial determination that he is entitled to release begs the question: how much time is reasonable and how much tolerance is there for administrative delay attendant to processing an inmate's release?"); *Green v. Baca*, 306 F.Supp.2d 903, 918 (C.D. Cal. 2004).

[24] *Berry*, 379 F.3d at 770–71.

[25] *Id*. (quoting *Green,* 306 F.Supp.2d at 918).

1. *LDOC is legally responsible for all individuals sentenced to state custody.*

According to Louisiana state law, once an individual is convicted of a state felony, legal custody of the individual is transferred from the Sheriff to LDOC.[26]  Consequently, LDOC's legal custody over individuals convicted of state felonies begins at the time of sentencing, at which point LDOC is responsible for ensuring that it obtains these individuals' preclass packets, enters their information into CAJUN, calculates their release dates, and releases them in a timely manner.[27]  This is true even where an individual is sentenced to time-served; once that state conviction is handed down, the person is in LDOC's legal custody and LDOC is responsible for ensuring that the individual is released in a timely manner.[28]

LDOC retains legal responsibility for all people in its custody, including those held in parish jails as opposed to a state penitentiary,[29] a fact which LDOC itself has acknowledged in ongoing litigation.  This is demonstrated by the Basic Jail Guidelines.  LDOC created these rules and standards that parish jails must follow in order to house people in LDOC's custody as part of a 1996 settlement that ended over 20 years of court supervision and consent decrees concerning almost all of Louisiana's jails and prisons.[30]  LDOC has explained that the purpose of the guidelines is "to assure that the fundamental constitutional rights" of individuals in LDOC custody "housed in local jails would not be jeopardized."  The guidelines are drafted and periodically updated by LDOC, and they provide LDOC with significant influence over the operation and management of parish jails as it relates to the people in LDOC's custody.  As the Fifth Circuit recently held, "[t]hrough the promulgation of the Basic Jail Guidelines . . . there is ample evidence that [LDOC officials] had power to control the facilities in which [LDOC] housed its prisoners."[31]

2. *Deficiencies in LDOC's policies and practices are the cause of systemic overdetentions.*

LDOC is liable for a constitutional violation when its polices or practices "causally result[ ]" in the violation.[32]  In examining causation, courts may properly consider how individual policies or practices interact with one another within the larger system, such that the

---

[26] La. Rev. Stat. § 15:824(A); (C)(1); La. Code Crim. Proc. Art. 933(3) (a "felony" is defined as "an offense that may be punished by death or by imprisonment at hard labor").

[27] *See Crittindon*, 37 F.4th at 183 (pursuant to the Basic Jail Guidelines "parish jails housing state prisoners must send pre-classification paperwork to DPSC so that DPSC can enter the prisoner's information into its computer system, calculate the prisoner's release date, and issue the release").

[28] *Crittindon*, 37 F.4th at 184, 187.

[29] La. Rev. Stat. § 15:824(A).

[30] *Crittindon*, 37 F.4th at 182.

[31] *Id.* at 191.

[32] *Id.* at 186.

harm caused by a particular policy or practice may be exacerbated or mitigated.[33]  A "policy or custom" can include a "policy of inaction"; in other words, LDOC can be liable for a failure to adopt a policy and a failure to train or supervise subordinate officials when that inaction results in a constitutional violation.[34]

LDOC has legal responsibility for the people in its custody and has authority over the local parish facilities where they are housed.[35] As part of that legal responsibility, which attaches from the moment an individual is convicted of a state felony, LDOC must ensure that it receives the necessary paperwork, processes an individual's release, and actually releases the individual in a timely manner.[36] In light of this duty, it follows that deficiencies in LDOC's policies and practices "causally result" in the systemic overdetentions of incarcerated people in their custody.[37]  Specifically, the long-standing and widespread overdetention of LDOC prisoners is the result of LDOC's failures in three areas:  (a) failure to adopt adequate policies related to the delivery of sentencing paperwork to LDOC for individuals in LDOC custody who are housed in parish jails; (b) failure to adopt adequate time computation and data management processes; and (c) failure to adequately train LDOC employees.

### a.    Failure to adopt policies related to the delivery of sentencing paperwork for individuals housed in parish jails

Despite its legal responsibilities for the people in its custody and its ability to exercise control over local parish facilities where they are housed, LDOC has failed to implement basic policies and practices necessary to ensure that it receives complete and accurate preclass packets in a timely manner.  Preclass does not have any procedure or mechanism in place to learn when an individual has been sentenced to state custody prior to its receipt of the preclass packet from the local facility housing the individual.  Preclass does not get involved with or exert influence over the part of the post-sentencing process that causes the majority of the delays resulting in overdetention—the transfer of sentencing paperwork from the Clerk of Court to the Sheriff and the subsequent transfer of the preclass packet from the Sheriff to Preclass.

As outlined above, upon sentencing, the Clerk of Court prepares the Bill of Information and Uniform Commitment Order, which the judge signs.  These documents are not submitted electronically; instead, they are typically delivered by either physical mail, fax, or hand delivery depending on the parish.  Once the parish jail receives the paperwork from the court, it assembles the preclass packet.  But again, there is no standard procedure for submitting these documents to LDOC.  Sheriffs' offices may mail them, email them, or drive them over to Preclass, depending on the parish.  On average, based on data from January to April 2022, it took 21 days from the

---

[33] *See M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018).

[34]  *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011); *see also Porter*, 659 F.3d at 446; *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022).

[35] La. Rev. Stat. §15:824.

[36] *Crittindon*, 37 F.4th at 182–184.

[37] *Crittindon*, 137 F.4th at 186–87.

time of sentencing for LDOC to receive the preclass packets for individuals who were entitled to immediate release at the time of sentencing.

LDOC has known since 2012 that developing a system with the functionality to receive preclass packets electronically would dramatically improve the timely delivery of preclass packets to LDOC.  Still, LDOC has never taken steps to implement such a system.  In fact, when the Clerks of Court Association offered to begin electronically submitting sentencing documents to LDOC in 2016, LDOC refused, claiming that it would create more work for his department.  Six years later, LDOC still does not have any formal plan to adopt a system that would allow it to receive sentencing information and records electronically from the courts or even to track delay attributable to the courts.  LDOC has never asked the Clerks of Court Association for input in developing any new system related to time computation, sentencing calculations, or paperwork submission.

During the Department's investigation, both Secretary James LeBlanc, LDOC's Chief Executive Officer, and LDOC's Undersecretary of the Office of Finance and Management acknowledged that restructuring the Basic Jail Guidelines and CEAs to require the timely delivery of sentencing documents from the parish jails is entirely within LDOC's control.[38] Secretary LeBlanc further acknowledged that LDOC could institute a policy of tracking the frequency of delayed or deficient preclass packets in order to identify the specific parish jails contributing to these issues and address them accordingly.

Even once it receives the preclass packet, LDOC has no defined formal process that Preclass follows in the event it receives incorrect or incomplete paperwork from the parish. LDOC personnel stated that around 5 to 10 of every 60 preclass packets received daily are missing at least some documents.  When Preclass receives a deficient packet, an analyst reaches out to a point of contact at the parish jail who submitted the packet.  If the analyst is unable to acquire the requested information from the point of contact, the analyst alerts a manager to receive assistance in coordinating with the parish jail to receive the missing information.  The analyst is then expected to create a case narrative outlining the steps taken to get in contact with the parish jail and acquire the missing preclass documents, and then upload the case narrative into Oracle.

While LDOC designed its case narrative policy to ensure that the narratives provide "documentation for future reference" with respect to delays in processing cases, the current model does not allow Preclass to effectively identify and prioritize preclass document requests and follow-up actions based on case narratives.  This deficiency stems from limitations on how Preclass analysts can access case narratives in Oracle once they are uploaded.  In order to locate a case narrative and identify an outstanding preclass document request, an analyst must perform a manual review of individual Oracle files.  Oracle also indexes and stores case narratives

---

[38] In July 2022, LDOC drafted revised Basic Jail Guidelines that include a deadline of three working days for Sheriffs to deliver certain documents to Preclass.  We were informed by LDOC that the deadline only applies to certain supplemental documents that may be required after time computation is complete, but does not apply to the preclass packet itself.  The revised guidelines have not been implemented and there is currently no expected implementation date.  Even if the deadline were implemented, there is no system in place to track whether Sheriffs are complying with the deadline, and no consequences for non-compliance.  Nevertheless, the revision demonstrates LDOC's ability to impose deadlines, if it chooses.

involving deficient preclass packets in the same category as case narratives for other topics, including probation or parole-related matters; there is no way to triage case narratives by topic area without undergoing a lengthy review. LDOC does not otherwise collect or track data related to delays caused by receipt of deficient preclass packets, although anecdotally LDOC personnel have acknowledged this problem as a cause for additional delay.

**b.     Failure to adopt adequate time computation processes**

Further delays are occasioned by LDOC's antiquated time computation process, which relies on manual processes and an obsolete 30-year-old offender management database. Problems with these systems are compounded by LDOC's failure to perform adequate quality checks and audits and to collect data related to time computation errors. While LDOC has plans to upgrade its time computation system, this investigation raised concerns that the plans are being implemented in a way that will severely limit their effectiveness.

**(i)     LDOC's time computation and release processes are unnecessarily time-consuming and prone to error.**

For all individuals in LDOC custody, an intake group does an initial screening of the preclass packet once it is received by Preclass. This process includes verification of the contents of the preclass packet, entering the information into CAJUN, and scanning documents into Oracle. While LDOC maintains that intake personnel are told to prioritize the processing and time computations for people entitled to immediate release, there is no formal policy in place on how to identify and prioritize these people. Instead, intake personnel are left to visually scan each person's preclass packet and guess if the person is due for immediate release and should be prioritized. This means that while LDOC's policies call for the prioritization of immediate releases for release date calculations, a strategy aimed at preventing overdetentions, Preclass does not give the intake group the tools to operationalize such a policy correctly. In fact, even when local facilities send daily counts to LDOC, that information is not compared against CAJUN to identify the potential universe of individuals who may be overdetained.

Following intake, preclass uses the data entered into CAJUN to generate a sheet containing the person's DOC number, length of sentence, and parish of conviction and sends it to the time computation group. After the time computation group verifies the person's docket and offense number in CAJUN, they perform a time computation. Determining a person's release date requires a manual calculation that is based on a variety of potential factors, including the date of sentencing, the length of the sentence, credit for time served, good time credits (including credits earned for certified treatment and other programs, and credits lost due to behavior), and parole revocation calculations. The time computation group then utilizes a "check system" to verify the accuracy of its release date calculations, which requires both the analyst who performed the time computation and a second analyst to make notations on the calculation sheet to indicate that they verified the accuracy of the calculation.

The intake and time computation processes are rife with errors and delays. The legislative audit conducted in 2017 found that, in a sample of 100 CAJUN files, 19% contained at least one data error. LDOC responded to the findings by instituting a monthly audit examining release date calculations across five categories: personal data, time computation, offender class,

docket/offense, and sex offense.  But the 2019 legislative audit continued to find a high rate of errors—it sampled 40 time computations and found an error rate of 12.5%, and that 52.5% of computations did not have notations indicating that their accuracy was verified in accordance with LDOC's check system.  And only after time computation is complete can Preclass begin its release procedures, which LDOC has described as "cumbersome and time consuming."

Delays and errors in time computation and release procedures are ongoing.  From January to April 2022, it took an average of 24 days after preclass packets were delivered to LDOC for people designated as immediate releases to be released.  This alone suggests that LDOC's internal "check system" and monthly audit processes are not functioning properly.  During our investigation, we also examined monthly audits from January 2019 to May 2021, and found that entire groups of audit sheets had incomplete sections, leaving it unclear whether the monthly auditors had actually completed the auditing process for the sampled time computations for those months. Relatedly, our review of calculation sheets found that the time computation check system, in which notations are made on the calculation sheets to verify the accuracy of each calculation, was not being consistently performed.  Often entire sections, and sometimes entire calculation sheets, were missing one or both notations, leaving it unclear whether the calculations' accuracy were ever verified.

### (ii)     LDOC does not track data related to time computation.

LDOC hampers its own ability to address errors and delays in its time computation process by failing to track overdetention-related data, including the frequency of overdetentions, the frequency at which courts and parish jails fail to submit timely and complete preclass packets, and the amount of reimbursement payments sent to parish jails for housing individuals during periods when they were overdetained.  Tracking that information would enable LDOC to reliably assess the scope and certain root causes of overdetentions, which could then inform targeted measures to correct deficiencies throughout various steps in the intake and release process.  This would also allow LDOC to reliably assess the ongoing cost of systemic overdetentions.[39]

Our investigation found that from January to April 2022 alone, LDOC spent at least $850,000 in reimbursement payments to parish jails for housing people during periods of overdetention. LDOC is aware that robust and consistent data tracking practices is a key component of a strategic response to systemic overdetentions, given that it was an important finding from the 2012 Lean Six Sigma audit. There are, however, no current plans for LDOC to consistently track overdetention data.

---

[39] Parish jails have no financial incentive to take affirmative measures to help decrease overdetentions because LDOC pays the jail for each day of overdetention.  That LDOC does not currently assess the cost of overdetentions, particularly when they are due in part to delays by parish jails in delivering preclass packets, evinces a particular lack of urgency with respect to understanding the scope of the ongoing overdetentions.

   (iii) **LDOC's projected data modification projects will not prevent the overdetention of individuals in LDOC custody.**

  LDOC and the Office of Technology Services (OTS), which is part of the Louisiana Division of Administration, are currently working on a data modernization project. These efforts include the development and implementation of the Corrections Information Program and Records System (CIPRS), a new Offender Management System (OMS). When finished, LDOC will use CIPRS to manage all electronically stored records and information related to a convicted individual's custody. While updating LDOC's offender management system is potentially an important step toward resolving some of the issues related to overdetention, it is important to note that CIPRS, as currently designed, will not address significant fundamental problems contributing to the overdetention of people in LDOC custody:

- CIPRS will not include a system for the electronic submission of preclass packets and other necessary sentencing documents. While LDOC management acknowledges that the electronic submission of preclass packets is central to resolving LDOC's overdetention issues, there are no plans to integrate that function into the upcoming CIPRS system.

- CIPRS lacks a system for receiving daily information regarding new convictions from state court, which would allow LDOC to identify people in its custody prior to receiving their preclass packets from the parish jails.

- CIPRS lacks the capacity to receive and track timely updates regarding offender activities and other events that could trigger an eligibility change or key date shift that may result in new release date.

  LDOC also plans to incorporate a stand-alone time computation component into CIPRS that is being developed by a third-party vendor, Mi-CASE, which is designed to perform automated calculations of inmates' sentences, jail time credits, and release dates. This approach is highly unusual. Generally, states will acquire a full-scale system from a vendor that incorporates all necessary functions in order to avoid potential data transfer and data tracking issues between multiple systems.

  LDOC's unique approach entails serious risks, in particular with respect to whether the two systems can be functionally integrated. Even if they can be, the development and implementation of CIPRS is planned in nine phases, of which only three have a scheduled release date. [40] CIPRS will not have the functionality to replace CAJUN until later phases of the project, meaning that LDOC will have to continue using CAJUN and Oracle to manage offender records in the meantime.

  This means that, for the foreseeable future, the data upon which Mi-CASE relies will need to come from CAJUN and Oracle, which operate in a different format. In order for Mi-

---

[40] The Mi-CASE component was projected to be delivered in late 2022. Of the nine phases of the CIPRS project, only Release 1.0 has been deployed, and Releases 1.1 and 1.2 were targeted for completion in Fall 2022. As of the date of this letter, the Mi-CASE component and Releases 1.1 and 1.2 were still undergoing testing and may not be complete until early 2023. Releases 2 through 9 have no scheduled completion date.

CASE to function properly, each individual data element in CAJUN and Oracle will need to be mapped to the proper data fields in Mi-CASE, a large and complex undertaking. Data mapping of historical records for currently incarcerated offenders will need to be addressed at the same time, and it is imperative that there are sufficient audit systems in place to ensure that, once mapped, the historical records remain accurate. While the incremental data mapping of historical records is currently underway, LDOC does not appear to have plans or resources in place for necessary tasks associated with their data mapping efforts. For instance, it is unclear whether LDOC has an adequate strategy for performing audits to validate the accuracy of historical data.. In the absence of such an effort, Mi-CASE's ability to improve time computation outcomes and prevent further overdetentions is unclear.

Finally, LDOC's failure to address the problem of information-sharing among courts and Sheriffs is likely to cause further problems with the Mi-CASE component. For example, if LDOC does not receive a comprehensive packet of information from a court or parish with all the required data elements, it is unable to capture the information in CAJUN (and later CIPRS) and will not have the required data for the Mi-CASE component to accurately execute time computations. Delays in the transfer of information, delays in following up on requests for data, high-priority cases packaged in with standard cases, and errors in transcription from paper or email to the required CAJUN fields are all very likely to occur as a result. Consequently, even if LDOC does follow-through on its plans for CIPRS and Mi-CASE, the likelihood of incorrect and delayed processing of releases may remain as high as it is today under the current processes.

### c.      Failure to Train LDOC Staff

LDOC's training programs for the intake and time computation groups further drive errors and delays. All analysts within Preclass receive the same initial orientation training. This training consists of four modules: (1) Verifying Paperwork; (2) Updating CAJUN; (3) Time Computation; and (4) After Time Computation. According to Preclass personnel, the initial module-based training covers only the basics of Preclass functions and does not address the more complex aspects of release date calculations that are likely to drive errors, namely the variety of issues that may emerge on account of the numerous, and sometimes unique, factors guiding a given calculation. Further, not all basic Preclass functions are reflected in the module training program. For instance, the modules do not contain instructions on the release date calculation check system or the monthly auditing system, key time computation group functions.[41]

As a result, a significant portion of the on-the-job training for the time computation group takes place either after an error has occurred or concerns about an individual case have been raised. During weekly staff meetings, for instance, supervisors conduct additional trainings for the time computation analysts that range from 30 minutes to two hours depending on the topic. These trainings often involve scenario-based topics based upon observed difficulties or concerns experienced by the analysts. Lastly, there are one-on-one spontaneous trainings that are conducted in response to unusual release date calculation scenarios. These one-on-one trainings may also be conducted in response to observed errors in an analyst's calculations, though they

---

[41] On November 17, 2022, LDOC initiated a pilot program to cross-train employees in intake and time computation, which LDOC believes will allow it to deploy employees more effectively. As of the date of that discussion, it was too early for LDOC to assess the impact of the program. LDOC is also in the process of adding additional group training sessions to its schedule, but those trainings would be based on the existing modules.

are not informed by monthly release date calculation audit results.  This approach is reactive as opposed to proactively ensuring that each analyst is prepared for the variety of scenarios they are likely to encounter.

LDOC also insufficiently updates the training materials for its initial orientation modules, which were originally created in 2013 and have not been revised since late 2018.[42]   Given the frequent turnover in the Preclass and known gaps in time computation analysts' preparedness, ensuring the thoroughness of the initial module training program is critical.

### 3.    *LDOC is acting with deliberate indifference because it has known for a decade that its policies unconstitutionally cause the overdetention of people in its custody.*

LDOC is liable for Fourteenth Amendment violations when it acts, or fails to act, with "'deliberate indifference,' a 'disregard [for] a known or obvious consequence of [their] action[s].'"[43]  This standard requires LDOC to have 'actual or constructive notice' that its failure to adopt policies or adequately train employees will result in constitutional violations.[44]  The notice requirement "typically requires showing notice of a 'pattern of similar constitutional violations' due to deficient policies, permitting the inference that Defendants deliberately chose policies causing violations of constitutional rights."[45]

LDOC is deliberately indifferent in its failure to implement adequate policies and adequately train its employees in order to prevent systemic overdetentions.  Our investigation uncovered a decade long pattern of violations dating back to at least 2012, when Secretary LeBlanc initiated a project to audit the Preclass time computation process in partnership with Lean Six Sigma.  The Lean Six Sigma audit found that it took, on average, 110 days from the date of an individual's conviction for LDOC staff to process and complete a person's time computation. This led to a backlog of over 1,400 cases that were awaiting a time computation, 83 percent of which were for people being overdetained.

More recent data collected in the course of this investigation show that the problem continues unabated.   Specifically, the Division's expert consultants examined data from a four-month sample period from each of the years 2012, 2017, 2021 and 2022, and found mounting instances of overdetention totaling 522, 677, 1102 and 1108, respectively.  In those data sets, between 49 and 67% of the individuals overdetained were held more than a month past their release date.  LDOC itself reported that in 2017, there was an average of 200 cases a month considered immediate release, and that these individuals were held an average of 49 days past their release date.

---

[42] LDOC informed us on November 17, 2022, that it had begun the process of revising the modules, although there is no formal deadline for their completion.  LDOC estimates that they could be complete by the summer of 2023.

[43] *Crittindon*, 37 F.4th at 186; *see also Porter*, 659 F.3d at 446–47.

[44] *Crittindon*, 37 F.4th at 186 (addressing a failure to adopt policy claim); *Porter*, 659 F.3d at 446–47 (addressing a failure to train claim).

[45] *Crittindon*, 37 F.4th at 186; *see also Porter*, 659 F.3d at 446–47.

The 2012 Six Sigma audit attributed overdetention to delays associated with both the delivery of preclass packets from the courts and the parish jails and deficient training and workflow processes in LDOC's time computation groups.  It also noted that LDOC's insufficient training for Preclass functions was a root cause of systemic overdetentions, and that, due to the high amount of staff turnover with its time computation analysts, it was important for LDOC to develop standardized and comprehensive training materials to account for the variance in experience within Preclass.  The Fifth Circuit recently held that "the relevance of the Six Sigma study is obvious—that the defendants were each keenly aware of the flaws of the system that failed to timely release prisoners."[46] The court concluded that LDOC officials "cannot avoid the evidence that the study exposed unlawful detention of prisoners.  A reasonable factfinder would likely conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rise to the level of deliberate indifference."[47]

Our investigation found that LDOC had ample notice from additional sources of the decade-long pattern of overdetention.  In addition to the Six Sigma audit, LDOC's notice of the pattern of overdetention is evidenced by the 2017 and 2019 Louisiana legislature audits of LDOC's records management systems that alerted LDOC to deficiencies in its training protocols.[48] The former, a performance audit report, found that LDOC's procedures for monitoring data entry, especially for people housed in local facilities, were insufficient to consistently identify data errors.  The report also found that LDOC's process for time computation lacked standardized guidance, resulting in inconsistent methods and systemic errors. The 2019 report was a financial audit that evaluated LDOC's operations and system of internal quality control.  That report found a number of errors in sampled time computations and that there was insufficient supervisory review of release date calculations.

In the face of the knowledge that it was systemically overdetaining people in its custody, LDOC also undermined its own ability to learn about overdetentions through its phone information line that offered guidance and instructions to families with concerns about delayed time computations.  As recently as 2019, families contacting this line were told that the timeframe for the completion of time computations was approximately four and a half months *after* sentencing, a timeframe that has no basis in LDOC's formal policies or procedures. Consequently, any family contacting LDOC regarding a delayed time computation was not referred to LDOC's grievance process until after at least four and a half months had passed since sentencing.  For the families of individuals entitled to immediate release, this inaccurate guidance essentially instructs them not to utilize the grievance process unless they had been overdetained for approximately four and a half months.

---

[46] *Crittindon*, 37 F.4th at 191.

[47] *Id.* at 187.

[48] Louisiana Legislative Auditor, *Mgmt. of Offender Data: Processes for Ensuring Accuracy, Dept. of Corr.* 6–9 (Oct. 25, 2017) ("2017 Legislative Audit"), *available at* https://app.lla.state.la.us/PublicReports.nsf/1284612EDBDB25E5862581C40056189F/$FILE/0001674C.pdf; Louisiana Legislative Auditor, *Dept. of Pub. Safety and Corr.—Corrections Services, State of La.* 1–2 (Oct. 23, 2019) ("2019 Legislative Audit"), *available at* https://app.lla.state.la.us/publicreports.nsf/0/b9ba7e809f593d2c8625849c0050eb3b/$file/0001e569.pdf?openelement &.7773098.

At least 15 private lawsuits filed against LDOC in recent years regarding overdetention have also provided notice of systemic overdetention.[49] Many of these lawsuits not only alleged that the individual plaintiffs have been overdetained—in one instance for as many as 164 days—but also alleged an ongoing pattern of overdetentions.[50] While some LDOC officials have successfully had claims against them in their individual capacities dismissed on qualified immunity grounds,[51] not one court opinion has undermined the basic factual assertion that a pattern of unconstitutional overdetention in Louisiana has persisted for years.[52]

In sum, LDOC has been deliberately indifferent to its widespread and persistent pattern or practice of overdetention for over a decade.

### 4. *LDOC's inadequate efforts at reform do not mitigate the finding of deliberate indifference.*

Over the past decade, LDOC has intermittently taken steps to address its systemic overdetention problems. The solutions it has pursued, however, either failed outright or have been insufficient to achieve genuine reform. They are therefore inadequate to mitigate our finding of deliberate indifference.

In the years following the 2012 Six Sigma report, LDOC took steps to implement some of the report's recommendations. Specifically, it organized a centralized Preclass Department (currently spread across three regional offices) and standardized certain preclass procedures. LDOC also pursued legislative efforts to streamline the paperwork required from the Clerk of Court, resulting in 2017 legislation requiring the standardized Uniform Commitment Order in preclass packets instead of the minutes of the sentencing hearing, which were much more time-consuming to complete.[53] Crucially, however, LDOC did not take any steps to address the

---

[49] *See, e.g.*, *Buchicchio v. LeBlanc*, No. 3:22-CV-00147 (M.D. filed La. Mar. 2, 2022); *Humphrey v. LeBlanc*, No. 3:20-CV-00233 (M.D. La. filed Apr. 15, 2020); *Crittindon, et al. v. Gusman, et al.*, No. 3:17-CV-00512 (M.D. La. filed Aug. 2, 2017).

[50] *See* Second Am. Class Action Compl., *Humphrey v. LeBlanc*, No. 3:20-CV-00233 (M.D. La. Apr. 29, 2021); Second Am. Compl., *Grant v. Gusman, et al.*, No. 2:17-CV-02797 (E.D. La. Apr. 10, 2018); Am. Compl., *Crittindon, et al. v. Gusman, et al.*, No. 3:17-CV-00512 (M.D. La. Aug. 31, 2017).

[51] *See, e.g.*, *Grant v. LeBlanc*, No. 21-30230, 2022 WL 301546, at *5–6 (5th Cir. Feb. 1, 2022).

[52] *See, e.g.*, *id.* (acknowledging public reports documenting overdetention while holding those facts did not overcome qualified immunity); *see also Hicks v. LeBlanc*, 832 F. App'x 836, 842 (5th Cir. 2020) (recognizing that "the alleged facts suggest a pattern of over-detention caused by quality control deficiencies and the lack of training and supervision"); *Giroir v. LeBlanc*, No. 21-cv-108, 2022 WL 969614, at *7 (M.D. La. Mar. 30, 2022) (holding that plaintiffs' allegations of a pattern of overdetention based on the 2012 Six Sigma study demonstrated "a substantial likelihood of success on the merits" sufficient to proceed on a claim for injunctive relief); *Traweek v. Gusman*, No. CV 19-1384, 2021 WL 199387, at *5 (E.D. La. Jan. 20, 2021) *vacated and remanded on other grounds sub nom*. *Traweek v. LeBlanc*, No. 21-30096, 2022 WL 2315444 (5th Cir. June 28, 2022) (referencing "a staggering volume of factual evidence of incompetence and indifference in the Department headed by LeBlanc" and stating that the "disturbing nature and sheer weight of this 'pattern evidence' is compelling").

[53] The Uniform Sentencing Commitment Order, commonly referred to as the "Uniform Commitment Order" or "UCO," is a one-page form order completed at time of sentencing and signed by the sentencing judge that outlines, among other things, the offense(s) of conviction, date of sentencing, sentence length, any sentence enhancements or reductions, whether the sentence is to run concurrently with or consecutively with another sentence, and whether the

report's recommendation to "reduce the transferring of paper files between institutions," which today remains a significant source of the delays causing overdetentions.

Between July 2012 and June 2016, LDOC paid a vendor $3.6 million dollars to develop a new Offender Management System (OMS) to replace CAJUN.  The new OMS went live on June 15, 2015, but it experienced a complete system failure just six weeks later.  The 2017 Legislative Audit attributed the failure to LDOC "implement[ing] the system without the testing necessary to ensure it functioned correctly."[54]  The audit further noted that LDOC "staff lacked a complete understanding of how the OMS worked and how it presented data."[55]  LDOC worked with the contractor to salvage OMS, but once the contractor's contract expired in June 2016, LDOC lacked "the resources and understanding necessary to resolve" the system's remaining problems.[56]  LDOC thus reverted to CAJUN, despite well-known deficiencies in that system.  For example, CAJUN does not have any automated data input capabilities; instead, all data must be entered manually, which leads to erroneous and incomplete records.  The 2017 audit found that "CAJUN data is not always accurate, and [LDOC] does not have adequate policies and procedures to manage offender data."[57]  LDOC still uses CAJUN at present, and it continues to contribute to overdetentions.

 In 2019, LDOC submitted a grant to the Department of Justice for funding to develop a new data management system, in which they acknowledged that in 2017, hundreds of people a month were being overdetained.  While LDOC did not receive federal funding at that time, it is currently undertaking the development of an updated data management system, CIPRS.  As detailed in Section V.B.2.b.iii., the scope of that project is insufficient to address the systemic deficiencies leading to overdetention.

Finally, in 2020, LDOC submitted a proposed bill to the state legislature addressing the delivery of documents from the Clerks of Court to Sheriffs, and LDOC's time computation for individuals entitled to immediate release.   The bill proposes that the Clerks of Court be allowed fifteen days to send paperwork to the Sheriff's office following sentencing.  In the case of immediate releases, it gives LDOC up to fifteen days to complete time computations *after* LDOC receives the preclass packet from the Sheriff's office, and it attempts to shield LDOC from liability if time computations are completed within that time frame.   The bill does not address a time frame for the delivery of preclass packets from the Sheriffs to LDOC.  LDOC is currently considering whether to resubmit this bill in the next legislative session.  If this legislation were to

---

individual should receive credit for time served.  *See* State of Louisiana Uniform Sentencing Commitment Order, *available at* https://www.lasc.org/judicial_admin/forms/UCO_2019.pdf.; *see also* La. Code Crim. Proc. Ann. Art. 892 B.(1)(b).

[54] 2017 Legislative Audit at 11, *available at*
https://app.lla.state.la.us/PublicReports.nsf/1284612EDBDB25E5862581C40056189F/$FILE/0001674C.pdf.

[55] *Id.*

[56] *Id.*

[57] *Id.* at 2.

take effect, people entitled to immediate release could be held under Louisiana law for over a month after their legal release date in violation of their constitutional rights.

LDOC has therefore remained unable or unwilling to comprehensively address the decade-long systemic overdetention of people in its custody in violation of their Fourteenth Amendment right to timely release from incarceration.

## VI.    MINIMAL REMEDIAL MEASURES

To remedy the constitutional violations identified in this Findings Report, we recommend that LDOC implement, at minimum, the remedial measures listed below:

A.    **Technological Upgrades**

1. **Short-Term Information Exchange Practices.**  While developing a third-party information sharing system (described below in Section A(2)), implement an interim electronic file sharing system that includes, at a minimum, the capacity to:

   a.  Share documents and information electronically among courts, parish jails and LDOC, including the electronic submission of sentencing documents, case information updates that are pertinent to new release date eligibility, documents on the offender's release checklist required for the issuance of a release certificate, and preclass packets from courts and the parish jails to LDOC;

   b.  Allow LDOC, the courts, and parish jails to electronically request documents from each other;

   c.  Enable LDOC to track and review user activity and document requests.

2. **Long-Term Technological Upgrades**

   a.  Develop a functioning Criminal Justice Information Sharing (CJIS) system. The CJIS system should be designed to meet constitutionally adequate standards for data definition and exchange protocols.  It must include, at a minimum, the capacity to:

      ii.  receive timely notification of when an individual is sentenced to state custody;

    iii.   share documents and information electronically among courts, local jails, and LDOC in a manner that is structured and standardized, including the electronic submission of sentencing documents and preclass packets from courts and the parish jails to LDOC;

    iv.   receive timely notice of events and updates that could trigger an eligibility change or key date shift that in turn may result in new release eligibility or release dates;

    v.   allow LDOC, the courts, and parish jails to electronically request documents and case information from each other;

    vi.   generate an audit log function that would enable LDOC to track and review requests for preclass packet documents;

    vii.   receive and track in a timely manner the information and documents on the offender's release checklist required for the issuance of a release certificate (e.g., warrants/detainers, sex offender registry, DNA files, pending charges).

b.  Ensure that the sentence calculation functionalities that LDOC is planning as part of its Mi-CASE component incorporate automated event trackers that monitor case information updates and flag cases for automated sentence calculation.  The automated event tracker must, at a minimum:

    viii.   capture sufficient metadata to enable the prioritization of immediate releases for automated sentence calculation;

    ix.   include the constant monitoring of subsequent case information updates that are pertinent to new release date eligibility, and the capability to flag such cases for automated sentence re-calculation;

    x.   include an audit log that allows Preclass personnel to review in detail events that trigger an automated sentence calculation.

c.  Develop strategies and timeframes for the decommissioning and replacement of the legacy CAJUN and Oracle databases with CIPRS, including a plan for ensuring that CAJUN and Oracle can compatibly function with Mi-CASE while CIPRS is completed.

21

**B. Inter-agency Coordination**

    a. The Basic Jail Guidelines should be revised to require:

        i. The immediate or near-immediate delivery of preclass packets for those entitled to release upon sentencing, and the timely delivery of all preclass packets as a precondition for reimbursement payments to parish jails;

        ii. The electronic submission of an individual's preclass packet via a CJIS System or, in the interim, via an electronic file sharing system as described above;

        iii. Daily reports to be electronically sent to LDOC with the number of individuals housed in parish facilities who received state convictions and subsequently entered LDOC's custody via a CJIS System or, in the interim, via an electronic file sharing system as described above;

        iv. Parish facilities to collect data measuring the timeliness of their receipt of sentencing information from the Clerks of Court, and further require that this data is reported to LDOC in a manner that allows LDOC to sort and prioritize the data to identify individuals considered a high priority for LDOC Preclass processing

        v. Parish jails to provide LDOC with the timely notification of events and updates to an incarcerated individual's file that would result in new release eligibility, including events and updates that impact an individual's eligibility for education, program, or good time credits via a CJIS System or, in the interim, via an electronic file sharing system as described above;

        vi. The electronic submission, via a CJIS System or, in the interim, via an electronic file sharing system as described above, of any documents and information prepared or maintained by the parish jails that are necessary for LDOC to release an individual from custody;

        vii. Each parish jail to have a dedicated preclass liaison on staff who is responsible for:

            1. Ensuring the timely submission of completed preclass packets to LDOC Preclass;

2. Ensuring the timely notification of LDOC Preclass of subsequent case information updates that are pertinent to individuals' release eligibility;

3. Attending mandatory specialized trainings conducted by LDOC Preclass training instructors.

viii. Ensure that current and future Cooperative Endeavor Agreements incorporate the terms and conditions of the Basic Jail Guidelines.

ix. Ensure that the Basic Jail Guidelines establish an audit process to evaluate parish jails' compliance with the revised Basic Jail Guideline provisions implemented in accordance with the minimum remedial measures described in this sub-section.

b. Institute a policy of tracking the frequency of delayed or deficient preclass packets in order to identify the specific courts and parish jails contributing to these issues and address them accordingly.

c. Request that the Clerks of Court ensure that courts provide daily notification to LDOC of individuals sentenced to LDOC custody via a CJIS system or, in the interim via email using a standardized subject line.

d. Arrange a meeting between the Sheriffs' Association and the Clerks of Court Association to discuss strategies and timeframes for ensuring that the Sheriffs and Clerks of Court are prepared to utilize the CJIS system or, in the interim, the electronic file sharing system described above.

**C. Quality Assurance and Supervision**

a. Develop and implement a plan for compiling regularly scheduled reports on the frequency and impact of overdetentions, the cause(s) of those overdetentions, and any corrective action taken in response. Ensure that such reports are stored and maintained electronically.

b. Develop and implement a comprehensive quality assurance plan to identify and correct deficiencies with LDOC's information management systems to ensure data and algorithmic accuracy.

c. Employ regularly scheduled and documented meetings between the Chief of Operations, the Assistant Deputy Secretary for the Office of Adult Services, and the Basic Jail Guidelines Coordinator to address existing and emerging concerns related to overdetention.

d. Conduct a review of Preclass' auditing protocols and instruments for time computations to ensure that audits identify all the elements of the subject matter to be audited, include documentation of what was audited, identify subject matter compliance and non-compliance with existing policies and procedures, and provide recommendations to correct errors or discrepancies within a designated timeframe.

e. Ensure that audit findings are stored and maintained electronically, and are incorporated into reviews/revisions of policies and training.

f. Develop and implement standardized protocols for corrective action in the event of identified errors or cases of non-compliance with Preclass policies and procedures.

**D. Training**

a. Develop and implement a standardized and documented plan for the delivery of comprehensive in-service, supplemental, and remedial training for Preclass personnel.

b. Develop a standardized manual, available for reference, to ensure that personnel follow uniform procedures and methodologies in performing Preclass functions, including the release date calculation check system, monthly auditing for the release date calculations, and methods for prioritizing immediate releases for preclass packet processing.

c. Develop a specialized training program for parish jails' Preclass liaisons to ensure that they follow uniform procedures and methodologies in preparing and submitting preclass packets, and notifying LDOC Preclass of subsequent case information updates that are pertinent to individuals' release eligibility.

d. Develop and implement standardized and documented protocols for annually assessing the content and delivery of training, including the ongoing review of training curricula, lesson plans, and manuals. This annual review should be based upon monthly audit data and observed problem areas to ensure that training is incorporating the key functions for Preclass personnel.

e. Develop and implement a certification process for all time computation analysts to ensure that analysts are proficient and qualified to perform time computations.

24

### E.  Policies, Procedures

    a.  Develop, revise, and implement adequate policies and procedures to ensure the implementation of the minimum remedial measures identified above.

    b.  Ensure that policies and procedures are reviewed on at least an annual basis and updated as necessary.

---

## VII.    CONCLUSION

In summary, our investigation found reasonable cause to believe that LDOC consistently detains incarcerated individuals past their release dates in violation of their rights under the Fourteenth Amendment to the United States Constitution.  We conclude that these violations are pursuant to a pattern or practice of infringement on the constitutional rights of incarcerated persons.

We are obligated to advise you that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies identified in this Findings Report if State officials have not satisfactorily addressed our concerns.  42 U.S.C. § 1997b(a)(1).  The Attorney General may also move to intervene in related private suits 15 days after issuance of this Report. 42 U.S.C. § 1997c(b)(1)(A).  Please also note that this Findings Report is a public document.  It will be posted on the Civil Rights Division's website.

We look forward to working cooperatively with you and LDOC administrators and staff to ensure that these violations are remedied.